# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Manchester, :
      Petitioner :
  :
    v. : No. 14 C.D. 2022
  : Submitted: July 15, 2022
Lincare Holdings Inc. and :
Liberty Insurance Company :
(Workers' Compensation Appeal :
Board), :
      Respondents :


BEFORE:  HONORABLE MICHAEL H. WOJCIK, Judge
       HONORABLE CHRISTINE FIZZANO CANNON, Judge
       HONORABLE STACY WALLACE, Judge


<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WALLACE         FILED: September 29, 2022


Robert Manchester (Claimant) petitions for review of the Workers' Compensation Appeal Board's (Board) December 28, 2021 Order that affirmed a Workers' Compensation Judge's (WCJ) January 5, 2021 Decision denying Claimant's Reinstatement Petition (Reinstatement Petition). On appeal, Claimant argues the Board erred in determining that the WCJ's decision was reasoned, supported by substantial evidence, and not based upon findings of fact that contravened previously adjudicated facts. Upon review, we affirm.

## I.  Background

In 2011, Claimant was a delivery driver for Lincare Holdings Inc. (Employer).

Reproduced Record (R.R.) at 115. In addition to driving, Claimant's job required him to load and unload vehicles with medical equipment. R.R. at 115-16. On June 7, 2011, Claimant slipped and tore the meniscus of his left knee in the course and scope of his employment. *Id.* at 116. Employer accepted the work injury, and Claimant began receiving workers' compensation benefits. On August 5, 2011, Dr. Jeffrey Kann performed a meniscectomy on Claimant's left knee, removing a portion of Claimant's left meniscus. *Id.* at 117. Claimant recovered well from surgery and returned to work for Employer. *Id.* As a result, Claimant's workers' compensation benefits were suspended as of October 3, 2011. *Id*. at 3, 130.

Claimant continued to work for Employer until 2012, when he voluntarily left Employer and began working for Lowe's. R.R. at 117-18, 130. Shortly thereafter, Claimant left Lowe's and accepted a delivery driver position with Consolidated Construction (Consolidated). *Id.* at 118. Claimant testified in this matter that his knee was "doing pretty good" and that it "felt good" while he was working for Consolidated. *Id.* at 120.

On November 28, 2015, Claimant re-injured his left knee, this time while in the course and scope of his employment with Consolidated. R.R. at 120. Following this injury, Claimant was unable to return to work. *Id.* On February 2, 2016, Claimant filed a Reinstatement Petition (2016 Reinstatement Petition) against Employer, alleging he "suffered a worsening of his condition related to the accepted work injury that resulted in decreased earnings power." *Id.* at 3. Claimant also filed a Claim Petition against Consolidated, alleging he suffered a left knee injury in the course and scope of his employment with Consolidated. *Id.* Claimant and Consolidated entered into a Compromise and Release Agreement, which was a full and final release for the injury of November 28, 2015. *Id.* at 274.

Employer contested Claimant's 2016 Reinstatement Petition. At hearings held on that matter, Claimant presented the testimony of Gregory Habib, D.O., and Employer presented the testimony of Michael Rytel, M.D., both of whom are board-certified orthopedic surgeons. *Id.* at 6, 8. The WCJ, in his findings of fact, determined that Claimant continued to suffer from the effects of the 2011 work injury, as follows:

> I find the opinions of Dr. Habib to be more believable and credible than any contrary opinions of Dr. Rytel regarding whether or not [] Claimant continues to suffer from the effects of the 2011 injury. Dr. Habib explained persuasively that the Grade IV changes noted in [] Claimant's knee subsequent to the 2015 work injury were consistent with ongoing degenerative changes that predated the 2015 work injury and stemmed from the removal of a large portion of the medial meniscus by Dr. Kann in 2011. Though, there was some reference in diagnostic studies to the possibility of some degenerative changes predating Dr. Kann's surgery, Dr. Habib persuasively testified that Dr. Kann's records of the operation indicate that there were no significant degenerative changes noted. (Dr. Rytel corroborated this.) Dr. Habib has convincingly testified that without the significant portion of the medial meniscus that additional degeneration occurs and that this is all related to the 2011 work injury.
>
> . . . .
>
> I find that Dr. Habib's opinion [that] Claimant developed post traumatic arthritic changes as a result of 2011 work injury to be believable and accept the same as fact. This indicates that [] Claimant has not fully recovered from the effects of the 2011 work injury, but, still continues to suffer from some effects of that injury.

R.R. at 9-10. Despite making these findings, the WCJ also determined that Claimant failed to prove he was disabled in 2016 due to the 2011 work injury, as follows:

> After carefully considering the evidence, I find believable and persuasive the opinions of Dr. Rytel and those of Dr. Habib on cross-examination that the current restrictions on [] Claimant's ability to work are related to the 2015 incident. [] Claimant testified credibly that he

3

did not have any problems performing his job duties for a period of more than 4 years after his 2011 injury and surgery. Though, he did see his Primary Care Physician for injections into the knee, he was still able to performed [sic] his physically demanding job as a delivery driver prior to the 2015 incident. Both medical expert witnesses testified that [] Claimant was able to continue to perform his work subsequent to the 2011 work injury and surgery and that he was able to perform the same activities that he is now restricted from performing. All of the evidence as presented indicates that the current restrictions on [] Claimant's ability to return to work were substantially caused by the 2015 work incident. It was only after that incident that he was put on restrictions.

To the extent that Dr. Habib testified on direct examination that the restrictions on [] Claimant's ability to return to work are attributable in part to the 2011 injury, I do not find those opinions to be persuasive or credible in part because he then changed his opinion on cross-examination wherein he conceded that the current restrictions stem from the 2015 incident. More importantly, I reject that opinion due to the overwhelming evidence that [] Claimant was able to work as a delivery driver where he had to use his left leg to operate a clutch, had to get in and out of the cab of his truck a number of times per day, and had to sometimes get onto the bed of his trailer to strap down loads before the 2015 incident. All of this changes after the 2015 incident. To attempt to then attribute the restrictions to the earlier injury is not credible.

[] Claimant has thus failed to show that his current loss of income is due to his 2011 work injury.

R.R. at 10. Accordingly, the WCJ denied Claimant's 2016 Reinstatement Petition. R.R. at 267. The Board affirmed the WCJ's decision on April 10, 2018, and this Court affirmed the Board's decision on March 14, 2019. *See Manchester v. Workers' Compensation Appeal Bd. (Lincare Holdings, Inc.)* (Pa. Cmwlth., No. 586 C.D. 2018, filed March 14, 2019), 2019 WL 1220889.

After his 2015 work injury, Claimant received conservative treatments for several years, including using a "medial offloading knee brace," receiving "multiple aspirations," where Dr. Habib "took fluid out of the knee and . . . injected cortisone

4

to the knee," receiving physical therapy, and taking prescription pain medications. R.R. at 213-14. Ultimately, on February 22, 2019, Claimant had total knee replacement surgery. *Id.* at 214.

On February 27, 2019, Claimant filed the current Reinstatement Petition against Employer. The WCJ held hearings on Claimant's Reinstatement Petition, and Dr. Habib testified again on behalf of Claimant. Dr. Habib opined that the cause of Claimant's need for his 2019 total knee replacement surgery was his 2011 injury and the loss of the majority of his left meniscus. R.R. at 224-25. Regarding the impact of the intervening 2015 injury, Dr. Habib further explained that:

> your typical arthritic issues usually take many, many years. We're talking about four years later he has a relatively insignificant injury that, for most of us, that if we kind of jumped off, kind of struck our knee, didn't really care anything, that we would be fine. But that 2015 injury, it became the -- sort of the precipice or that eruption of the volcano, if you would, stemming back from his 2011 injury with the large meniscal tear.

R.R. at 238. In other words, Dr. Habib said that Claimant's 2015 injury was "the straw that broke the camel's back." *Id.*

Dr. Daniel Agnew, a board-certified orthopedic surgeon, testified on behalf of Employer. Dr. Agnew opined that the cause of Claimant's need for his 2019 total knee replacement surgery was his 2015 injury. R.R. at 155. To support this conclusion, he stated as follows:

> [Claimant] undoubtedly had a previous injury in 2011, and this took him to arthroscopic care to include partial meniscectomy in August 2011. After that he appeared to have had a functionally very good outcome. He had reported to one examiner that he felt a hundred percent after that.
>
> The medical records would suggest only a couple of visits, and only one identifiable injection in the years that follow that. He was able to

5

leave orthopedic care. He was able to resume his full[-]time, full[-]duty time of initial injury job, and then later take other jobs delivering construction materials. It appears that he did quite well.

Thereafter, he had a November 2015 injury, and it was after this injury that several things appeared to have changed. One is he had resumed care and has never left orthopedic care. Another is he has never been able to resume employment since that injury, particularly his time of injury employment.

Finally, it appears to be this injury that culminated in total knee arthroplasty. That is, undoubtedly, before the November 2015 injury he had some degenerative change, but it was not enough to necessitate treatment. That is, it wasn't symptomatic enough to even go to the doctor regularly, much less have a big surgery.

It was after the November 2015 event that he appears to have returned to regular care, and, indeed, undergone total knee arthroplasty. Based on all those changes in his situation, even though arthritis was preexisting, I would suggest that the 2015 injury led him to the total knee arthroplasty of February 2019.

R.R. at 154-55. When asked about Dr. Habib's contradictory testimony, Dr. Agnew stated as follows:

Well, I believe that these are complex issues, and that we have to look not only at the radiographic development of arthritis, but whether or not that arthritis is causing enough symptomatology and activity limitation or functional limitation to necessitate treatment.

Meniscectomy comes in many different flavors. That is, the removal of meniscus can be a lot of meniscus or a little meniscus. In this case at least part of [Claimant's] meniscus was removed in 2011. Now, that gives him the possibility of developing arthritic change in his knee at a greater rate than the other knee.

However, that does not necessarily mean that the arthritis developing will get severe enough to necessitate treatment. Whether that treatment is frequent physician visits, physical therapy, bracing, or ultimately surgery.

Now, in this case, we'll never know. That is, we'll really never know the ultimate outcome of the 2011 injury because an intervening injury

6

in November 2015 happened, which drastically changed the picture for [Claimant]. It was after that that he returned to regular treatment. It was after that that he required not only additional conservative care, but ultimately total knee arthroplasty.

R.R. at 157-58. When asked if "there was enough symptomatology present" before the 2015 injury to warrant a total knee replacement, Dr. Agnew stated, "there certainly was not." *Id.* at 159. Based on the failure of conservative treatments that Claimant received in the years following his 2015 injury, Dr. Agnew opined that Claimant's total knee replacement was ultimately warranted in 2019. *Id.* at 159-60.

After receiving and reviewing all testimony in this matter, the WCJ noted in his decision that:

> [b]ased upon a review of the foregoing, and a review of all of the evidence of record, considered in its entirety, this adjudicator finds as fact that [] Claimant did not suffer a worsening of condition on February 22, 2019, because of the effects of the June 7, 2011 work injury.
>
> In so finding, this adjudicator generally finds credible the testimony of [] [C]laimant. He has had authentic problems with the left knee since June 2011 and is disabled from his medium/heavy-duty work as a truck driver/delivery worker.
>
> This adjudicator does not, however, find credible the testimony of Dr. Habib. He did not set forth a persuasive, pathophysiological, scientific opinion for saying the new incident of 2015 and its totally disabling effects thereafter, which effects lasted until February 22, 2019, should not be considered the reason for Claimant's need for the knee replacement, difficult convalescence, and unsuccessful rehabilitation. His testimony that traumatic arthritis from the 2011 incident and surgical intervention are responsible for the same is incredible. This opinion seems implausible, in the extreme, to the undersigned.
>
> In contrast, this adjudicator has credited the opinion of Dr. Agnew. This adjudicator notes the doctor's exceptional education, training, and practice credentials. He is not merely an examiner but a treating physician who undertakes knee replacements in actual practice and has vast experience in determining the success or failure of the same. He

7

was shown to have an excellent background with regard to [] Claimant's extended history. He provided a persuasive, scientific, pathophysiological explanation for his opinion. He was not shaken of his opinion despite meticulous, exacting, and expert cross-examination.

Dr. Agnew is, in particular, found credible when he says that, given the interposition of the 2015 incident, which was so acutely and permanently disabling, that one can simply not say whether the 2011 knee injury and the results of the surgical intervention at that time were contributory to the great arthritic change and (in any event) need for knee replacement some four years later. The opinion of Dr. Agnew is much more plausible in scientific reasoning than the opinion of Dr. Habib.

The opinion of Dr. Habib is rejected as incredible.

R.R. at 265. Accordingly, the WCJ, by order dated January 4, 2021, denied Claimant's Reinstatement Petition. Claimant appealed to the Board, which affirmed the WCJ's decision by order dated December 28, 2021.

## II.    Discussion

On appeal, Claimant argues that collateral estoppel should have precluded the WCJ from reaching his credibility determinations and factual findings. Additionally, Claimant argues that the Board's decision was not supported by substantial evidence and was not a reasoned decision. In a workers' compensation appeal, we are "limited to determining whether necessary findings of fact are supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *Elberson v. Workers' Comp. Appeal Bd. (Elwyn, Inc.)*, 936 A.2d 1195, 1198 n.2 (Pa. Cmwlth. 2007).

### A. Collateral Estoppel

Claimant's first argument on appeal is that the doctrine of collateral estoppel should preclude relitigating issues and credibility determinations that were decided in the litigation of Claimant's 2016 Reinstatement Petition (2016 litigation).

8

Specifically, Claimant asserts that the cause of the deterioration of his left knee, when comparing the June 7, 2011 injury and the November 28, 2015 injury, was determined in the 2016 litigation. Claimant further argues that "in the prior litigation, Dr. Rytel testified on behalf of Employer and his opinion, which the WCJ discredited, mirrored the subsequent opinion of Dr. Agnew, essentially pointing the finger at the November 28, 2015 work injury with Consolidated." Petitioner's Br. at 18.

"The doctrine of collateral estoppel, often referred to as issue preclusion, 'is designed to prevent relitigation of an issue in a later action, despite the fact that the later action is based on a cause of action different from the one previously litigated.'" *Namani v. Workers' Comp. Appeal Bd. (A. Duie Pyle)*, 32 A.3d 850, 856 (Pa. Cmwlth. 2011) (quoting *Pucci v. Workers' Comp. Appeal Bd. (Woodville State Hosp.)*, 707 A.2d 646, 647-48 (Pa. Cmwlth. 1998)). For collateral estoppel to apply, the following criteria must be met:

> (1) the issue decided in the prior case is identical to the one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the doctrine is asserted was a party or in privity with a party in the prior case and had a full and fair opportunity to litigate the issue; and (4) the determination in the prior proceeding was essential to the judgment.

*Pucci*, 707 A.2d at 648.

Collateral estoppel does not apply in this matter, because the issues decided in the 2016 litigation are not identical to the issues presented in Claimant's current Reinstatement Petition. In Claimant's 2016 Reinstatement Petition, the main issue was whether Claimant suffered a worsening of his condition as of November 28, 2015 (his second injury date). In Claimant's current Reinstatement Petition, the main issue is whether Claimant suffered a worsening of his condition as of February

9

22, 2019 (his total knee replacement date). The WCJ could not have decided this issue in the 2016 litigation, because Claimant's total knee replacement did not occur until 2019.

Even if the issues decided in the 2016 litigation were the same as the issues in this matter, the WCJ's findings and credibility determinations in this matter align with the WCJ's findings and credibility determinations in the 2016 litigation. The WCJ did not, as Claimant asserts, discredit Employer's expert in the 2016 litigation with respect to which injury caused Claimant's inability to work. Instead, the WCJ specifically rejected Claimant's expert's attempt to attribute Claimant's inability to return to work to the 2011 injury. Just as the WCJ did in this matter, the WCJ in the 2016 litigation credited Employer's expert, and discredited Claimant's expert, in determining that the November 28, 2015 work injury with Consolidated was the cause of Claimant's inability to work – not the 2011 work injury with Employer. Therefore, even if collateral estoppel was an applicable legal principle, it would not operate to prevent the WCJ in this matter from reaching similar credibility determinations and findings of fact as the WCJ did in the 2016 litigation.

### B. Substantial Evidence

Claimant's second argument on appeal is that the Board erred in concluding that the WCJ's decision was supported by substantial evidence.

"[S]ubstantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *See Waldameer Park*, *Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164 (Pa. Cmwlth. 2003); *Hoffmaster v. Workers' Comp. Appeal Bd. (Senco Prods., Inc.)*, 721 A.2d 1152 (Pa. Cmwlth. 1998). In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party that prevailed before the WCJ. *Waldameer Park*, *Inc.*; *Hoffmaster*. In a substantial evidence analysis where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that

10

made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding. *Waldameer Park, Inc.*; *Hoffmaster.*

Mere speculation or conjecture is insufficient to support a factual finding, but where there exists the ability to draw reasonable and logical inferences from evidence that is presented, including testimony, a conclusion so derived will be sufficient, even if it may not be the only possible conclusion. *See Fitzpatrick v. Natter*, 961 A.2d 1229, 1241-42 (Pa. 2008); *see also Moore v. Workmen's Comp. Appeal Bd. (Reading Paperboard Corp.*, 652 A.2d 802, 806 (Pa. 1995) (referee did not engage in speculation where there was relevant supporting evidence).

*W. Penn Allegheny Health Sys.*, *Inc. v. Workers' Comp. Appeal Bd. (Cochenour)*, 251 A.3d 467, 475 (Pa. Cmwlth. 2021).

After reviewing the record in this matter, we conclude that the WCJ's and the Board's factual findings are supported by Employer's expert's (Dr. Agnew) medical testimony, which is fully summarized above. In addition, the WCJ did not speculate in reaching his factual findings. Although there is evidence in the record (the testimony of Dr. Habib) that supports factual findings contrary to the WCJ's findings, the WCJ found that this testimony was not credible. Determinations of credibility and the weight to be afforded evidence are the prerogative of the WCJ. *Vols v. Workmen's Comp. Appeal Bd. (Alperin, Inc.)*, 637 A.2d 711 (Pa. Cmwlth. 1994). Accordingly, we accept the WCJ's credibility determinations and conclude that the WCJ's factual findings were supported by substantial evidence.

**C. Reasoned Decision**

Claimant's third argument on appeal is that the Board erred by concluding that the WCJ's decision was a reasoned decision. Specifically, Claimant alleges the WCJ did not: (1) rely on any objective evidence in determining that Employer's

11

medical expert was more credible than Claimant's medical expert, or (2) analyze the factual findings from the 2016 litigation.

Section 422(a) of the Workers' Compensation Act (Act),[1] 77 P.S. § 834, requires WCJs to issue "reasoned decision[s]."[2] In *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. 2003), our Supreme Court held that "a decision is 'reasoned' for purposes of Section 422(a) [of the Act] if it allows for adequate review by the [Board] without further elucidation and if it allows for adequate review by the appellate courts under applicable review standards. A reasoned decision is no more, and no less."

Claimant is not correct in asserting that the WCJ did not rely on any objective evidence in determining that Employer's medical expert was more credible than Claimant's medical expert. Instead, the WCJ extensively analyzed Claimant's treatment history and functional abilities / limitations, both before and after the 2011 and 2015 injuries. The WCJ noted that Claimant and both medical experts agreed that Claimant returned to work without restrictions and did not require orthopedic

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[2] In relevant part, Section 422(a) of the Act states as follows:

> all findings of fact shall be based upon sufficient competent evidence to justify same. All parties to an adjudicatory proceeding are entitled to a reasoned decision containing findings of fact and conclusions of law based upon the evidence as a whole which clearly and concisely states and explains the rationale for the decisions so that all can determine why and how a particular result was reached. The workers' compensation judge shall specify the evidence upon which the workers' compensation judge relies and state the reasons for accepting it in conformity with this section. When faced with conflicting evidence, the workers' compensation judge must adequately explain the reasons for rejecting or discrediting competent evidence. Uncontroverted evidence may not be rejected for no reason or for an irrational reason; the workers' compensation judge must identify that evidence and explain adequately the reasons for its rejection. The adjudication shall provide the basis for meaningful appellate review.

12

care after his 2011 work injury, whereas Claimant was unable to return to work and required numerous orthopedic interventions after his 2015 work injury. The WCJ then determined that Employer's medical expert's opinion did, and Claimant's medical expert's opinion did not, adequately explain this objective information.

Claimant is, likewise, not correct in asserting that the WCJ did not analyze the factual findings from the 2016 litigation. The WCJ acknowledged the prior factual findings. *See* R.R. at 262-63. Despite those acknowledged factual findings, the WCJ, just like the WCJ in the 2016 litigation, still found that Claimant's inability to return to work was caused by his 2015 work injury, not his 2011 work injury. This determination was upheld on appeal in the 2016 litigation.

The WCJ's decision in this matter is reasoned, as the WCJ explained his rationale so that this Court could clearly understand why and how the WCJ reached his determinations. Additionally, the WCJ explained its reasons for accepting testimony from one expert witness and rejecting the conflicting testimony of another expert witness.

### III. Conclusion

For the reasons set forth herein, we conclude that the Board did not commit any reversible errors in this matter. The Board correctly concluded that collateral estoppel did not apply to preclude the WCJ from making credibility determinations or factual findings in this matter.
The Board also correctly concluded that the WCJ's decision was reasoned and supported by substantial evidence. Thus, we affirm the Order of the Board.

_____
STACY WALLACE, Judge

13

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Manchester,                        :
                          Petitioner      :
                                          :
              v.                          :   No.  14 C.D. 2022
                                          :
Lincare Holdings Inc. and                 :
Liberty Insurance Company                 :
(Workers' Compensation Appeal             :
Board),                                   :
                        Respondents       :


# **O R D E R**


    **AND NOW**, this 29th day of September, 2022, the Order of the Workers'
Compensation Appeal Board, dated December 28, 2021, is **AFFIRMED.**


                                  _____
                                    STACY WALLACE, Judge